The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. We have what, Mr. Lin and Mr. McVeigh, are, both of you hear us? Yes, Your Honor. Mr. McVeigh, can you hear? You're on mute. Can you unmute? I still can't hear you. Yes, I can hear. Okay. We'll begin with the case of United States v. Loughry, and Mr. Lin will hear from you first. Thank you, Your Honor. Good afternoon, and may it please the Court. My name is Albert Lin, and I'm here on behalf of Justice Loughry. The only question in this appeal is whether the District Court should have held an evidentiary hearing into the Twitter activity of one juror in Justice Loughry's criminal trial. In my limited time, if I may, I'd like to focus on two reasons why we believe it could have done so. First, a hearing was required under the Supreme Court's decision in Remmer, and second, and independently, we believe the District Court set too high a bar for whether Justice Loughry's allegations warranted a hearing to explore juror dishonesty under McDonough. Turning first to Remmer, this Court has interpreted that decision as requiring an evidentiary hearing about external contacts if the defendant clears a minimal threshold. As this Court and the Supreme Court have stressed, the point of the evidentiary hearing under Remmer is, and I quote, to uncover facts for an informed decision on whether a new trial is warranted. And that is why the standard is simply whether the defendant has set forth credible, genuine allegations that there has been an external communication of the issue in Remmer and this Court's cases like Barnes and Hurst. There has to be, of course, more than speculation, but we think Justice Loughry has clearly exceeded that standard here. I think the Harris decision from the Sixth Circuit is instructive here. That's a unanimous decision written by Judge Seiler in the Sixth Circuit, and the facts there, I think, are even less compelling than the ones here, and yet the Sixth Circuit unanimously ordered a Remmer hearing. What happened there... Counsel, could I...about the Harris case, and I appreciate you bringing that up, that's the... and I appreciate you correcting me if I'm wrong on this, but that's really the only type of social media-related appellate decision that I saw, and if I'm wrong on that, I'd appreciate any correction. But isn't that case different? Because wasn't there... didn't the showing include the definite contact by the live-in girlfriend to the defendant? And that, to me, may be a difference. How do you distinguish...why is that the same if they knew there was contact into the social media account in Harris? Whereas here, I don't think...it's almost like a assumption there is because of the activity pre-trial and post-trial. Yes, Your Honor, if I could just quickly answer your first question. I think there's a couple other cases. There's the Ewing case involving Facebook, and there's a Ford case from this court. I'll be very clear. This court didn't order a hearing, but I think Ford and Harris set out some opposing benchmarks, and I'll address your question on Harris that I think are helpful here. So the issue in Harris, as Your Honor, you point out, the juror was the gentleman who was living there, and the individual who had contacted the social media account was the live-in girlfriend. The only evidence that was presented there was that the live-in girlfriend had accessed the LinkedIn account of the defendant. Now, Your Honor, I think that's important because for those of you who aren't familiar with LinkedIn, there was no contention that there was any prejudicial information on LinkedIn, anything about the matter that was before the jury. LinkedIn is just an online resume. I think that's a fair characterization of it. So that's all you had there, which was not the juror, but another individual who lived in the apartment had accessed something that didn't have anything to do with the matter before the jury. And then what the Sixth Circuit said is, based on that, it filled in several missing links. They said because there was that contact with LinkedIn, it is likely that the live-in girlfriend, who again was not the juror, had found that LinkedIn account through Google, and it was likely that in doing that search, she had accessed and encountered other things on Google that had to do with the case, and that then the live-in girlfriend, who had then not LinkedIn but something else, then discussed the matter with the juror, who was the boyfriend. And here, I think we have that's more compelling, if not the same as that, Your Honor. And here we've got the individual herself, the juror herself, and it's undisputed that she was on Twitter on several days during the trial, and not just that she viewed it, but she actually interacted with tweets on Twitter. She posted her own tweet, she liked one tweet, and she retweeted another tweet. So we know that the juror herself contacted Twitter. We also know that she followed these two reporters, and we also know that these two reporters tweeted quite a bit about the trial. In fact, Brad McElhaney, who was there at the trial every day, tweeted— Well, just to get the facts a little bit in perspective, as I understand it, she was on Twitter two days during the trial, two Twitters on one day and one on the other. And there's no evidence that she Twittered anybody else or that the Twitters involved anything about the case. So your logic seems to be that simply because she was on Twitter three times on unrelated matter during the trial, there was outside interference from somebody with respect to the trial. And I don't see how that follows at all. Maybe you can explain. Of course, John, I think there's a couple answers to that. The first is we know she was on Twitter these two days. I think, unfortunately, one of the difficult things with Twitter is you don't know if someone was on on different days. If she doesn't do anything on Twitter that is publicly manifested, whether that's by liking a tweet or retweeting or doing her own tweet, you don't know what that is. And I think that's really the difficulty we have here. I think you could compare this in some ways to if you know that the juror has viewed the evening news on multiple days during a multiple day trial, you know that there were segments in the news about the trial, but you don't know whether she was viewing them on the days that those segments were aired. But here we hear the tweets were not related to the trial. The tweets were unrelated and there's no forecast that those tweets included anything about the trial. It's just pure specular. Had any other tweet. We have three tweets in the evidence for the Remmer issue and there are ones on one day and two are on the other day and they were concededly unrelated to anything about the trial. This is not like the evening news that includes trial material and the questions whether she saw it. These tweets were unrelated and so it's you're asking us to speculate that because she used tweets on two days, she was tweeting other days relating to the case. With respect to your honor, I'd have to disagree with that because I think that the way Twitter works is much more like the evening news example. We know she was on Twitter. We know that she did those things. It doesn't mean that she that's all she did. When you get on Twitter and you scroll through your feed, there's a lot of things that you see of which there is no publicly manifested evidence that she saw, which is I think why the evening news analogy is apt. You don't know if that individual got up and went to the bathroom during the particular segment, made herself some popcorn, but you do know that she viewed a segment and in this case I would say the news on two days. I think that's the equivalent. You don't know what particularly she saw during that broadcast, but you know that she did see the broadcast at least at some point and I think that's what we have to do. Mr. Lynn, can I just say, I'm sorry, that analogy you where a court ordered a rumor hearing on those facts? I have not found one, your honor, but I would think that that would warrant a rumor hearing because I think that is enough. I think that's a credible allegation that gets you over that threshold and I think if you were to, I think you can compare those apples to apples, but I think even if you if you didn't, I think the internet, because it's different in some significant ways, requires erring on the side of holding the hearing. One of the important differences is, for example, unlike a newspaper, you can ask someone, your spouse, say take out the sports section or just give me the sports section. That's all I'm going to read. When you have a Twitter feed where you've got people you're following and mixed in there are these reporters who are tweeting multiple times a day, you can't say take that person out and there's no evidence that she even tried to do that. So again, all we're asking for here is we just want to know, what did she see? And I think it's a small price to pay to ensure that the Sixth Amendment rights of Justice Loffrey haven't been violated. Can I follow up on that? Of course, your honor. What do you think would be the sort of the limiting principle here? Because obviously the social media is not going away. It's something that we as judges have to, have to deal with and address with jurors, particularly trial judges. And it can't be the case that anytime someone is on social media in a case that the defendant would be automatically entitled to a remer hearing. So what do you say would be the limiting principle that we could apply, not just to fit these facts, but going forward? Of course, your honor. If I may just start with one point that I had promised Judge Falabalm I would address. I think the Ford case from this outer bound, the issue there was you had the jury foreperson whose husband's friend posted something on Twitter, definitions related to the trial. And the defendant had come in and said, well, I think it's possible that the jury foreperson had seen that tweet by the husband's friend on Twitter. And what was missing there was any evidence that the jury foreperson had even been on Twitter. So I think that's, so I just wanted to sort of close that point with Judge Falabalm that I think those, you know, Harris and that Ford, I think set some, some good boundaries. But Judge Diaz, I think in some ways, look, this is an inherently fact intensive analysis. And I think what you've got here are a lot of facts that could distinguish this from the next case. You have not just one access to Twitter, but two accesses on multiple days, not just somebody saying, I saw her scrolling through Twitter on her phone, but you actually know she interacted with Twitter and posted a tweet of her own. You have a high profile trial where you know that these reporters that she followed were tweeting multiple times a day, not a situation where maybe there were only a few tweets. So I'm not trying to avoid your question, Judge Diaz, but I do think that these are all inherently fact intensive cases. I think there's a lot of, a lot of facts here that could distinguish this from the next case. And one other thing I will say in terms of limiting principles, the juror, juror A here did not make the Twitter account private. And as a practical matter, there are limitations on the ability of a defendant to find stuff out about what a person was doing on Twitter. And going forward, there are practical limits on the effect of this rule. If a juror makes his or her Twitter account private, we wouldn't have the information we have here today about somebody being on Twitter. And so in some ways, I think Judge Copenhaver had, with all due respect to him, I, in all genuine earnestness, have a lot of respect for Judge Copenhaver, but he had a footnote in his opinion where he said, I recognize, the court recognizes the sort of inherent danger in prying into an individual's social media account. But I think that gets it backwards here. This is not an electronic diary. This is something that the, it's a self-curated newspaper. This particular juror left open to the public so that anybody could see it. And in fact, I think the lesson, if there's any, from the U.S. Supreme Court's decision in Dietz v. Bolden, which, as your honors know, is the case about re-impaneling a jury in a civil case, both the dissent and the majority, Justice Sotomayor in the majority and Justice Thomas in the dissent, recognized the real dangers of social media with respect to juries today. And so I think we've got enough facts here that you can build a little wall around this case if you're concerned about the next case. But I think what we have- Without minimizing the import of this argument that you're making about Renner, truth be told, I actually found the facts relating to the McDonough claim to be more troubling with respect to the likes and the retweets. So you're just about out of time. I'd like you to spend a few minutes talking about that. Of course, your honor. And on the McDonough claim, I think the difficulty there is, I think the district court's decision is very hard to square with this court's decision in Porter v. Zook, where this court said that the standard has to be lower than showing an actual merits violation of the Sixth Amendment. And I think that's what the district court here did. He relied on this incontrovertible evidence standard from the Second Circuit, which the government now does not defend. And after quoting that, he actually says that those facts, the facts in this case, without more, do not demonstrate that defendant's Sixth Amendment right was violated. That's a merits analysis. And that is, this court in Porter said very clearly that the standard for- I'm sorry, your honor. Judge Diaz, did you have a question? No, no, I didn't. I'm sorry. You froze a little bit and I saw your hand moving. You know, I think Porter makes very clear that it can't just be a merits analysis. And the government says that- Mr. Land, as you talk about Porter, do you mind, and I don't mean to cut you off because I want to hear all of your answer, but could you include in that this question, which is, does the fact that Porter is a 2254 case where there is a, I think, a statutory hearing requirement related to that, does that make any difference? Your honor, I think the answer to that is no, it doesn't. I don't think that the analysis there turned on the statutory hearing requirement. I think the analysis there turned on, as the court said, there were a number of barriers that the district court set up that I think were inappropriate. And one of them is, I see my time is about to expire. Should I finish my answer? Well, if you finished your answer, if you haven't finished your answer, you can finish it. Take a break. Of course. Thank you, your honor. I was just going to say, I think Porter makes very clear that the district court there set up a number of obstacles. One, the standard required proof of the merits. Second, the district court made some findings on the cold record. And third, that the district court required too much in the voir dire process. And I think the court in Porter said very clearly that counsel is entitled to rely on the answers that are given by the panel members in the voir dire. And I will resume on my reply. Thank you very much. All right. Thank you, Mr. Lynn. Mr. McVeigh? Yes. May it please the court, my name is Greg McVeigh and I represent the United States. The relief sought by the defendant in this case is anything but modest when he seeks a hearing to pursue jurors' activities without any evidence of dishonesty, bias, or misconduct. With regard to the Remmer issue, as your honors have pointed out, there is absolutely no evidence that this juror was in contact with or saw any tweet or any sort of publication about the trial activity. Mr. McVeigh, how would Justice Lowery and his lawyer have Your honor, I think a perfect example of how that evidence could be uncovered is comparing this juror's Twitter activity during trial to that that she had and was discussed before trial. She was active in either liking tweets, retweeting tweets. There has to be some evidence here, more than just speculation, that this juror actually engaged with and saw tweets that were tweeted by the press. The one... Well, that would be a slam dunk, but given the way that Twitter has been described in this briefing, that short of that, it's at least probable that when she was engaged in this tweeting activity that had nothing to do with the case, that given the scrolling activity and the way the system works, that it's more likely than not that she would have seen something related to the trial, particularly given the Twitter activity of the reporters in this case. Why isn't that at least enough to make an inquiry, to look into the matter, to have a hearing? Your honor, with every break, with every beginning day of the trial, Judge Copenhaver did ask and instruct, depending upon the time during the trial, as to whether or not any of the jurors had had any contact or had read anything or seen any tweets, newspaper articles, news reports, that sort of thing. He was very specific, also, in his instructions. Well, I guess the problem with that is, Mr. McVeigh, is that she was also asked to respond. She had not accurately at least responded to a couple of those questions. So, the mere fact that the juror didn't respond to the inquiries of the court is not by itself, I don't think, dispositive on this question. Your honor, there has to, again, the cases here, for example, the Ford case, which this court has adopted, does say it requires more than speculation. There has to be something more than just the fact that she had accessed Twitter. And the tweets that she was involved in, that she actually posted during trial, totally unrelated to the trial itself. The October tweet was on a Saturday, was not even a court date. So, none of them had anything to do with the trial whatsoever. There has to be something before we delve into a juror's activity, before, I would assume, in this case, we would bring a juror back to be questioned about her activity. Juror's privacy is of interest here. So, there has to be more than just saying, well, she happened to be on Twitter. Do we, how, excuse me, I'm sorry, Mr. McVeigh, but how at all should we factor the sort of her pre-trial Twitter activity and her clear interaction with these reporters and likes and retweets of reports? Well, as I stated earlier, it would seem to me that this is or liked other tweets. It clearly shows she did have activity. There is absolutely no activity with regard to the reporters in this case. None is seen during the time that she tweeted during the course of this case. That in and of itself, I believe, would tend to show that she was obeying the court's instructions and not interacting with the reporter's tweets. I would also say that I would, I would disagree to some degree with the comparison of the tweets with a newspaper or news articles. I mean, if this court were to, or the lower court, to grant a hearing based upon just the fact that this juror had a Twitter account and used it, it would be no articles there. So the fact that she has a newspaper in and of itself ought to allow a Remmer hearing to then allow us to delve into whether or not this juror actually read those, those newspaper accounts. There's virtually no different. The courts do have to, and the United States recognizes that the courts do have to make perhaps more detailed instructions for the jurors and I do believe that Judge Copenhaver did that. As I stated earlier, he mentioned very specifically various means of social media and it's kept those instructions all the way through the trial. So again, there's just nothing here that would indicate this juror ever saw any of the tweets, any of the news articles, any activity of the reporters whatsoever. And it is pure speculation, which this court has said is not enough to grant a Remmer hearing. So counsel, if I could follow up on Judge Diaz's question. I think I understand your point that if you look at the pre-trial activity to the during trial activity, you don't see the same thing. And I think you're taking that as evidence that she stopped doing what she was doing pre-trial. And I guess I understand that. You know, it seems like from what I can read, this is not an active social media person like, you know, say my kids might be or something like that. And the amount of activity she spent on social media seemed, you know, fairly concentrated on this issue. Does that take, even though that was pre-trial, does that take this out of the realm of speculation? I don't believe so because you still have to concentrate on the time of the trial and what we know happened during the course of the trial or in this case, what we know did not happen or at And in order to say that this particular juror was involved with and interacted with or had communication with in any way, shape, or form of the, with the reporter's Twitter account is just pure speculation. There's nothing here at all. Mr. McVeigh, you said three different things here there was involved with, engaged with, and had communication with the Twitter feeds of these separate things. And Judge Quattlebaum raises a good point, given the fact that she appeared to have a very narrow window of social media activity, not like some other people. Isn't it more likely than not that even if she didn't retweet or like the tweet during the trial, that given the limited bandwidth of what she might've been looking at on Twitter, it would at least more likely than not that she might've seen those, those reports that were being tweeted out virtually every day. Well, and again, your, your honor, there's just no evidence of that. Absolutely, because I agree with you because, because of the way Twitter is designed to work, there would be no evidence of that, but that doesn't mean that it didn't happen. And, and, and so you, you, you have to ask yourself whether given this context and given what had happened before the trial, whether at least it warrants some further investigation. Your honor, again, I, I would, would still argue that comparing her activity pre-trial to her lack of activity with those during trial would still go to show that, that she was abiding by the encounter with, with the tweets by the various news reporters and comparing her, her actions there. There's just nothing there to show that. With regard then to the, to the McDonough issue, it's clear from Judge Copenhaver's order that he did not necessarily apply the Agnello standard. He does indeed cite to Agnello as one example of a standard to apply for McDonough, but also went through the Porter case, the Williams case, Fourth Circuit cases, and it is clear based upon his rulings that his denial of a McDonough hearing was based upon just the facts of this case. This juror did freely admit that she had watched or had, had knowledge of the impeachment proceedings and freely admitted that. And for whatever reason, strategic or otherwise, defense counsel did not choose to follow up with her on Wadeer. She then became one of, of the jurors in this trial. Do you think that he would have followed up Ms. McVeigh with her had she answered at least the two questions that Judge Copenhaver indicated she had not been truthful about correctly? Well, I would respectfully disagree that, that Judge Copenhaver said she'd not been truthful. He said that perhaps she did not give complete answers. I, I just read his, his order a bit differently in saying that she was not truthful. But regardless of that, the defendant's claim particularly on the second prong of McDonough clearly fails is simply because she would have known about the trial or known about the impeachment or other facts of the case in and of itself would not necessarily rise to a causal strike. Mr. McVeigh, it was more than just simply that she knew about the impeachment, knew about the trial, is that she had liked a certain number of tweets that express anti, that express a dislike of the, the actions that were alleged against Justice Lowery. It wasn't simply that she knew about it, it is that she had expressed via a retweet or a like an opinion about it. That's an entirely different ball of wax, don't you think? It's a, it is a different ball of wax, Your Honor, but at the same time, simply because a person may have preconceived notions about a person's guilt, about a defendant's guilt or knowledge of the case, the issue is whether that can be set aside and whether or not a jury can decide the case based on the evidence. So, Mr. McVeigh, on this issue, to me at least, yeah, I think about the pre-trial activity, you know, maybe a little different in the McDonough case and the actual bias claim. Yeah, I, maybe I'm, maybe I need to go back and look at it, but I thought Judge Copenhager said that, you know, the first prong of the McDonough test had not been established due to the fact that overall her answers were, you know, forthcoming, even if she could have said more on the questions to which she said no. You know, she freely admitted her awareness of the impeachment information, for example, and so, but the actual bias claim doesn't require misconduct, as I understand it, and Judge Diaz makes the point that some of those pre-trial activity did involve, you know, approval of negative comments. Does that, if you could address the actual bias claim, I'd appreciate your answer on that. Yes. Well, again, simply because a juror may have even an opinion as to a preconceived notion about a defendant's guilt, again, the question is whether or not that can be set aside. This juror, in an answer to general questions, said with whatever knowledge she had that that could be set aside and that she could answer or abide by, rather, the instructions of the court and only view this case based upon the evidence. I think, too, the fact that what the verdicts show themselves argues against any bias in this case. Judge Copenhager pointed out that one of the more notorious stories was about the Cass Gilbert desk, that that story was through the press all before trial. That was one of the counts that the jury acquitted on. So, virtually half the counts that that defendant was charged with, this jury acquitted and one was ultimately dismissed. So, I think, Mr. McVeigh, can I ask about that? So, yes. Are you suggesting that we simply, in cases like this, line up the number of guilty findings, the number of acquittals, and if one is more than the other, then that's the end of the analysis? Not at all. That's not the end of the analysis, but certainly that is an important factor to be considered. Didn't the jury in this case convict him of one of the most more serious charges, which Judge Copenhager then entered a judgment of acquittal on? Yes, that is correct. The lying to the FBI, and then Judge Copenhager set that aside. But it's clear still, though, from the evidence, or from the verdict rather, that the jury very carefully considered the evidence and acquitted this defendant on numerous charges and didn't, took a very serious look at what the evidence was. So, again, one has to concentrate not on necessarily what this juror knew or even what her preconceived notions were, but it's whether she was able to set those aside. She indicated that she could. She indicated, too, that she was aware of the impeachment proceedings, and again, for whatever reason, and it was, voir dire was available to the defense counsel, for whatever reason, decided not to use that and not to question her and left her on the jury, along with another juror who also indicated they were aware of the trial and the impeachment proceedings and the different proceedings against the defendant that were occurring pre-trial. Mr. McVeigh, in this case, I read the whole voir dire, and it seems to me you have, in your answers, sort of equated guilt with knowledge. She didn't, the case with knowledge, with the impeachment, and during voir dire, the court started out questioning the panel, the jury, the veneer about the case, whether they knew about the case, they read about the case and so forth, and she answered no to those. And then the court says, apart from what you've told me about this case, let me ask you, among you, have heard anything about the impeachment? And that distinction was also emphasized in an earlier dialogue with a juror, that when the court was talking about the case, he was talking about the case before the court, the indictment and the charges, and the impeachment was some pre-existing conduct. She answered yes to the impeachment evidence, and of course, all the tweets related to the impeachment. And then the court asked that group of people who stood up on the impeachment, could you set aside that and find a fair verdict and so forth, and she was responsive to that. They then were given the opportunity to call every one of those people up, and some were called up by counsel, but others were not, including juror A. And so I don't see anywhere where she could even be slightly mis-answering a question based on, if you actually read the questioning of the judge, he started out asking about the case and made it clear he's talking about the case. Then he turned to the impeachment and said, aside from the case, let's talk about the impeachment. And that's when she stood up on that, whether they could set aside that and find the trial. So I'm not sure you should concede that she heard anything about the case, which is the indictment and the charges that were filed in the case. She denied having heard that. That's correct, and I stand if corrected if I misstated that. She did very clearly answer questions about the impeachment, and Judge Kopenhaber, in his order, even emphasized in the questions that were discussed there that were asked of the jurors, even emphasized and underlined the questions were about this case. And Judge Niemeyer is correct that she did not. He went even further. He not only separated the question and said, apart from what you've told me about this case, I want to ask you about the impeachment. And then the next page he says, whether or not, insofar as those impeachment proceedings may have had any impact whatsoever, and I'm not suggesting they do on this matter, are you able to put that aside and base your verdict on the evidence, et cetera. And so it was very clear in the dialogue with the jury, the jury veneer, that he was and juror A answered the impeachment and responded she could proceed and set that aside in the case. And she was also available for further questioning and counsel forwent that possibility. That's correct. I would agree with that. I am out of time. We would ask, however, that the request for the hearing be denied. All right. Thank you, Mr. McVeigh. Mr. Lin. Thank you, Your Honor. If I may, I'll start with the Porter and actual bias issue. I think the question there really comes down to what is the standard for determining whether there is a hearing. And I think it's clear from the record that the district court applied basically a merits-based standard. I think if he had applied the colorable claim standard that is followed by other circuits, I think on the face of his own opinion, he should have granted the hearing. He says. Mr. Lin, if I could. The Porter-Williams cases, I think, are important cases for us to consider both in the McDonough and the actual bias claim. Yeah, I mentioned an issue that you didn't think was that important, being the statutory issue. I appreciate your answer on that. But isn't a difference in those cases that you had pretty much pretty clear, incorrect answers given by the jurors there? Whereas here, again, maybe there's an argument that could have been more complete, but it seems much less clear that the juror gave incorrect answers. And it seems to me that's important part of Judge Thacker's opinion, that if you have an incorrect answer, maybe it increases the flexibility on how you look at the second part of the analysis. But if you don't have incorrect answers, and you probably disagree that there's not incorrect answers, but if you assume that there are at least a difference there, does that make those cases different in some way? I think the answer to that question is no, Your Honor. Well, I mean, I think it's difficult to figure out what necessarily where the line is on how clear the incorrectness is when it's a question of omission, which I think is what we're dealing with here. And really, I'm not sure, Your Honor, that you need to define that line very clearly, because again, I think the important dividing line here is that we don't have to have enough to win on the merits, right? We don't have to show that there is a McDonnell claim. We don't have to prove one. We don't have to prove that there's actual bias. We just have to show that there's a colorable claim. And I think if you look at the district court's opinion, there's been a lot of discussion about what did he actually say. He says, and Juror A may have of this case, not just this case, the facts of this case. That's what Judge Copenhaver said himself. And I would submit that that alone, if you apply a colorable claim standard, that clears the colorable claim standard. He then turns to prong two. And I would say, even on the face of it, he does not say there's no colorable claim that there may be a valid challenge. Mr. Lynn? Yes, Your Honor. I think it would be helpful if you had the full question, which the judge asked. He was asking about the case, the indictment. And this is what the court said to the jury panel. You've heard what I told you about what little I've told you about this case as set forth in the indictment. Do any of you have any personal knowledge of the facts of this case? Now, in that case, he's talking about the facts that's charged in the indictment. She answered no. But when it came time for him to ask about the impeachment proceedings, she said yes. And there was a clear distinction made not only by judge but by another juror in trying to clarify that. And the judge clarified it twice. I'm not asking you now about the facts of the case. I'm asking you about the impeachment. And she said yes. And then he followed up and said, could you render a fair verdict? And she responded accordingly. But I think in order to take, I don't, I think it might be a little misstatement to say that when she's asked about personal knowledge of the facts of this case, that that's referring to the impeachment. The judge was talking about what was charged in the indictment. And that only followed the earlier question, the very first question, is what do you know about this case? And so it's helpful just in the analysis. It's not, it's clearly not a slam dunk. Your points are well taken. But it seems to me to consider the facts, we ought to take the full context of the point here. I understand, Your Honor. My time has expired. If I may answer. Yes, of course. So the response I would have to your question, Judge Niemeyer, is I think, one, I don't think the answers to those two questions are necessarily inconsistent. I think you can, you can claim that you have no facts of the knowledge of the facts of the indictment, if we're to use that understanding, as well as saying you had knowledge of the existence of the impeachment, if you had no other knowledge about the underlying facts of the impeachment. And so I think under Porter, there would not be an obligation for the defense counsel to ask more. But my final point on this is, well, I guess your point is, it's fairly taken that the impeachment proceedings would rely on some of the same facts as the indictment would rely on. And that's fair enough. The question, I suppose, though, is whether that was appreciated by the jury in light of the questions. And, and I think you can, you have to take both positions into account when looking at the indictment. I understand, Your Honor. And I just think that what Porter says about the situation is, we don't know what the follow-up answers would be. And that's the point of the hearing. And I guess my final point on this is, I would just come back to you. I think it is true. We obviously, Your Honors, need to look at the entire board of your transcript. But I think Judge Kopenhaver himself, having been the one who asked the questions, looking back over his record, he acknowledges that she may have been less than truthful. And I think that that alone is enough. And on the second prong, he says that it's doubtful that there may have been enough for a valid challenge to cause. But he does not say that there's no world in which that would be true. And again, I think it really comes down to what is the standard that's supposed to be applied here. And if this court is really unsure about that on the record, I think you could remand alone on the fact that the district court judge here applied the wrong standard in deciding whether an evidentiary hearing was required. All right. Thank you, Mr. Lynn. Thank you, both counsel. This is the time when we would come off the bench and shake your hands. And that's a tradition we have not given up. Obviously, we can't do it now, but we do it virtually and extend our greetings to you. And thank you for your arguments. We'll take a short recess before the next case to reconstitute attorneys. Thank you very much. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Albert Diaz, A. Marvin Quattlebaum Jr.